UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Milton F. Wright**                                :
**14814 Cloverdale Road**                           :
**Woodbridge, VA 22193**                            :
                                                    :
    **and**                     :
                                                    :
**Milton F. Wright Trucking, Inc.**                 :
**14814 Cloverdale Road**                           :
**Woodbridge, VA 22193**                            :
                                                    :
    **Plaintiffs**              :
                                                    :
**vs.**                                             :   **Civil No:** _____
                                                    :
**Synagro Mid-Atlantic, Inc.**                      :
**7014 E. Baltimore Street**                        :
**Baltimore, MD 21224**                             :
                                                    :
**SERVE ON:**                                       :
    **CT Corporation System**   :
    **1015 15th Street, NW, Suite 1000** :
    **Washington, DC 20005**    :
                                                    :
    **and**                     :
                                                    :
**Synagro Technologies, Inc.**                      :
**1800 Bering Drive, Suite 1000**                   :
**Houston, TX 77057**                               :
                                                    :
**SERVE ON:**                                       :
    **CT Corporation System**   :
    **1015 15th Street, NW, Suite 1000** :
    **Washington, DC 20005**    :
                                                    :
    **and**                     :
                                                    :

| | |
|---|---|
| **CDR Mid Atlantic** | : |
| **P.O. Box 70** | : |
| **59 South 3rd Street** | : |
| **Oxford, PA 19363** | : |
| | : |
| **SERVE ON:** | : |
|     **CT Corporation System** | : |
|     **1015 15th Street, NW, Suite 1000** | : |
|     **Washington, DC 20005** | : |
| | : |
|     **Defendants.** | : |

_____

# COMPLAINT

COMES NOW Plaintiffs, Milton F. Wright, individually, and Milton F. Wright Trucking, Inc., by and through undersigned counsel, and for their Complaint, state as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of this action pursuant to 42 U.S.C. § 1981, as well as supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a).

2. This Court has personal jurisdiction over the Defendants because they are parties to contracts executed in the District of Columbia and do business in the District of Columbia. Venue is therefore proper within the jurisdiction of the District of Columbia.

## PARTIES

3. Plaintiff, **Milton F. Wright Trucking, Inc. ("MFWT" and "Company" interchangeably)**, a Virginia for profit corporation, has been in operation as a 100% minority business enterprise in the business of trucking, spreading, disposing, and management of biosolids under contract with municipal wastewater treatment plants and industrial customers, including the District of Columbia. The Company started in 1977 and began biosolids services in 1984. Throughout its existence, MFWT has provided residuals management services as prime contractor and sub-contractor in connection with various biosolid management projects.

4.      Plaintiff, **Milton F. Wright ("Wright")**, an African American, is the founder, President, and owner of MFWT and was in charge of the day-to-day operations of the Company.

5.      Defendant, **Synagro Technologies, Inc. ("Synagro Corporate")**, a Delaware for profit corporation, with corporate headquarters in Houston, Texas and regional offices in El Dorado Hills, California, Waterbury, Connecticut, and Baltimore, Maryland, Mt. Arlington, New Jersey, and Columbus, Ohio, has operated as a Caucasian-owned provider of residuals management services to municipalities and industrial customers since 1986.

6.      Defendant, **Synagro Mid-Atlantic, Inc. ("Synagro")**, a Delaware for profit corporation, is Synagro Corporate's Central Region office located in Baltimore, Maryland, which provides residuals management services for the District of Columbia and other municipalities. The Central Region is comprised of several eastern and mid-western states, including the District of Columbia, Maryland, and Virginia.

7.      Defendant, **CDR Mid Atlantic, Inc. ("CDR")**, is an affiliate company of Synagro Corporate. Synagro Corporate acquired CDR.

## FACTUAL BACKGROUND

### *INTRODUCTION*

8.      This matter concerns Defendants' intentional conduct designed to deprive Plaintiffs of their civil and constitutional rights and in particular to interfere with Plaintiffs' rights to contract as a United States citizen and specifically as a minority-owned company in violation of Plaintiffs' civil and constitutional rights under the Civil Rights Act.

9.      The business relationship between Plaintiffs and Defendants date back to 1998, when Defendants, doing business as CDR Mid Atlantic, entered into various agreements with Plaintiffs to sub-contract residuals management services for various municipalities and industrial companies.  At all times

between 1999 and 2004, Plaintiffs and Defendants engaged each other to provide residuals management services in order to fulfill procured contracts.

10. Generally, Defendants procured contracts as the prime contractor from municipalities and subcontracted some of the work to Plaintiffs. On occasion, Plaintiffs procured municipal contracts as the prime contractor and subcontracted work to Defendants.

11. While Plaintiff was prime contractor, Defendants exercised substantial leverage and often mandated the terms under which it would provide hauling, spreading, and other residuals management services, frequently in Defendants' favor and to Plaintiffs' ultimate financial detriment.

12. Defendants, as prime contractor, likewise exercised substantial leverage in mandating the terms under which Plaintiff would provide sub-contracting services to Defendants, and usually Plaintiffs were treated differently than other non-minority subcontractors relative to the terms and conditions of these contracts.

### *THE PISCATAWAY WASTE WATER TREATMENT PLANT CONTRACT*

13. In 1998, Plaintiffs bid for and were awarded a contract (Contract No. 2127) with the Washington Suburban Sanitary Commission ("WSSC") to manage residuals from Piscataway Waste Water Treatment Plant in Accokeek, Maryland operated by the WSSC (the "Piscataway Contract"). Plaintiffs entered into an agreement with Defendants for Defendants to provide sub-contracting residuals management services to Plaintiffs. Defendants, as sub-contractors, were responsible for spreading residuals for Plaintiffs.

14. The residuals under the Piscataway Contract were to be spread on lands permitted by Defendants. At this time, Plaintiffs did not have any lands permitted for spreading residuals, or land application. Therefore, Defendants controlled whether Plaintiffs would benefit from providing land application services under the Piscataway Contract

15. To ensure that Plaintiffs benefited under the Piscataway Contract, both parties agreed that

Plaintiffs would participate in spreading residuals and that Defendants would sub-contract Plaintiffs to spread residuals on Defendants' permitted lands.

16. In fact, the parties agreed that Plaintiffs were to receive at least 60% of the contract value and that Defendants were not to exceed 40% of the contract value. Defendants, however, did not abide by this agreement.

17. Defendants engaged Caucasian-owned subcontractors to spread the majority of the residuals under the Piscataway Contract and excluded Plaintiffs from spreading said residuals, thereby breaching the parties' agreement and preventing Plaintiffs from financially benefiting under a contract that Plaintiffs had procured.

18. In 1999, the parties revised the Piscataway Contract in order to address Plaintiffs' concerns.

19. Despite the 1999 revisions, Defendants continued to exclude and did not engage Plaintiffs for land application services under the Piscataway Contract.

20. The Piscataway Contract was completed in and around August 2002.

### *THE WESTERN MARYLAND PROJECT*

21. In December 2002, Plaintiffs signed and entered into a Subcontractor Land Application Agreement with Defendants, under which, Plaintiffs were engaged to provide land application services to Defendants on both lands permitted by Plaintiffs and lands permitted by Defendants for the Western Maryland Project ("Western Contract").

22. Under the Western Contract, Plaintiffs were to spread biosolids received by Defendants from four (4) small plants in Western Maryland. When negotiating the terms of the contract, the parties had agreed that Plaintiffs would receive at least eight (8) to twelve (12) loads of biosolids per day for land application.

23. The Western Contract went along fine until a year after its commencement. In and around

December 2003, Defendants completely cut Plaintiffs off from receiving any loads of sludge to spread.

24.     Defendant's Project Manager for the Western Contract, Charlie Miller, told Plaintiffs that they stopped sending Plaintiffs sludge to spread because the distance to haul sludge to Plaintiffs was too far and therefore too expensive a venture. All the while, upon information and belief, Defendants continued to haul sludge to Caucasian sub-contractors for spreading, who were located similar distances as Plaintiffs and, in some cases, further distances than Plaintiffs.

25.     Plaintiffs made several complaints to Defendant about its hasty decision to cut Plaintiffs off from receiving loads under the Western Contract.

26.     Defendant's failed to remedy the matter and upheld Mr. Miller's decision to exclude Plaintiffs from spreading residuals under the Western Contract.

### *THE BLUE PLAINS CONTRACT*

27.     Defendants, however, had procured and maintained contracts to provide residuals management services for the Blue Plains Waste Water Facility ("Blue Plains") in Washington, DC (the "Blue Plains Contract"), and agreed to allow Plaintiffs to spread residuals Defendant received under the Blue Plains Contract in response to Plaintiffs' complaints.

28.     At this time, Plaintiffs and Defendant agreed that Plaintiff would receive at least ten (10) loads of sludge a day for spreading. These ten (10) loads would not come from Blue Plains alone. Actually, the parties agreed that the requisite ten loads would be comprised of loads of sludge hauled from both Blue Plains and Upper Occoquan Waste Water Treatment Plant; a contract Defendants had procured previously.

29.     This agreement, like the previous agreements, was never fulfilled.

30.     Shortly after making this agreement, Defendants began to default on their agreement to provide Plaintiffs the minimum loads of sludge to spread and continuously preferred to use Caucasian sub-contractors to spread most if not all of Defendant's sludge.

31. In the beginning of the Blue Plains Contract, Defendants sent Plaintiffs an average of five (5) or six (6) loads of sludge per day. But by April 2004, Defendants began to send Plaintiffs less and less loads of sludge and began to exclude Plaintiffs from spreading sludge.

32. Plaintiffs were forced, again, to complain to Defendants about their exclusionary and discriminatory treatment of Plaintiffs. During a meeting to address Plaintiffs' concerns in April 2004, Plaintiffs uncovered another form of discrimination perpetuated on Plaintiffs by Defendants.

33. Under Plaintiffs' Land Application Agreement, Defendants initially agreed to pay Plaintiffs $5.50 per ton for land application services. Plaintiffs discovered that Defendants had agreed to and at all times, were paying other Caucasian sub-contractors $6.00 per ton in addition to sending said sub-contractors substantially more tons of residuals to spread per day than Plaintiffs.

34. Plaintiffs also learned that Defendants had agreed to and were at all times reimbursing Caucasian sub-contractors for lawn mowing and certain other services for which it did not reimburse Plaintiffs. Plaintiffs lost over $ 50,000 under this deprived financial arrangement alone.

35. In May 2004, the parties agreed to revise Plaintiffs' Land Application Agreement to bring Plaintiffs spreading fees in line with all the other Caucasian sub-contractors to $6.00 per ton.

36. Defendants, however, decreased Plaintiffs' land permitting fees from $4.00 to $2.00 per ton and kept the goal for loads of sludge for Plaintiffs to receive for spreading to at least 50 loads per week, or about ten (10) loads per day.

37. Upon information and belief, Defendants, at all times referenced herein, paid Caucasian subcontractors more in land permitting fees than they paid Plaintiffs.

38. After the May 2004 revisions, Defendants continued to exclude and disengage Plaintiffs for land application services.

39. Ultimately, Defendants completely stopped sending Plaintiffs loads for spreading by the

end of August 2004 under the Blue Plains and Upper Occuquan Waste Water Treatment Plant Contracts. For the entire month of September 2004, Defendants did not send Plaintiffs a single load of biosolids for spreading, nor did they give Plaintiffs any notification or reason for their disengagement.

40. On September 27, 2004, Plaintiffs notified Defendants of their continued breach of all contracts with Plaintiffs and requested a meeting to review and discuss future dealings under the contracts.

41. Finally, on November 11, 2004, without response from Defendants, Plaintiffs were impelled to terminate its sub-contractor agreement with Defendants due to their continued discriminatory breach of its contracts.

### *THE UPPER OCCOQUAN SEWAGE AUTHORITY CONTRACT*

42. Simultaneously, in March 2004, Defendants constructively terminated a hauling agreement with Plaintiffs on a racially discriminatory basis.

43. In and around February 2003, Plaintiffs and Defendants entered into an agreement for Plaintiffs to provide sub-contractor hauling services to Defendants ("Hauling Agreement").

44. Pursuant to the Hauling Agreement, Plaintiffs provided hauling services to Defendants in connection with a contract that Defendants had procured with Upper Occoquan Sewage Authority ("UOSA") in Centreville, Virginia, to manage residuals from the UOSA Waste Water Treatment Plant ("UOSA Contract").

45. Plaintiffs also provided sub-contractor land application services to Defendants in connection with the UOSA Contract.

46. Under the UOSA Contract, Defendants agreed to provide Plaintiffs with at least four (4) loads of residuals to haul per day. Also, as stated above, Defendants had agreed to provide Plaintiffs with about ten (10) loads of residuals to spread per day under both the Blue Plains and UOSA Contracts.

47. By March 2004, Defendants had failed to abide by the UOSA Contract by failing to

provide Plaintiffs the requisite and agreed four (4) loads of biosolids to haul under the contract.

48. Plaintiffs notified Defendants of their failure to do so and despite Plaintiffs' concern, Defendants continued to provide Plaintiffs with low amounts of biosolids to haul.

49. Meanwhile, upon information and belief, around February 2004, UOSA management began paying its employees bonuses for each trailer the workers overloaded with biosolids beyond regulated weights. Normal loads consist of about 19.6 tons. UOSA overloaded Plaintiffs' trailers with as much as 89,000 to 94,500 pounds.

50. Upon information and belief, Defendants, at all times, were aware of and condoned UOSA's illegal overloading practices.

51. Defendants did not compensate Plaintiffs for hauling additional tonnage of biosolids overloaded onto their trailers.

52. By overloading Plaintiffs' trailers, UOSA and Defendants decreased the total number of loads Plaintiffs would have been able to haul under the UOSA Contract at additional pay, further breaching the terms of the Hauling Agreement and the UOSA Contract.

53. As a result of UOSA's illegal overloading practice, Plaintiffs' drivers were cited and fined by local authorities for hauling overloaded trailers. Additionally, Plaintiffs' trailers and trucks sustained substantial damages, for which Defendants refused to compensate Plaintiffs.

54. Plaintiffs notified Defendants of UOSA's illegal practice, about the damages to their trailers, and requested Defendants, as the prime contractor, to address these issues with UOSA. Defendants never addressed the matter nor remedied the problems.

55. Additionally, beginning in January 2004, UOSA had started to produce very low levels of biolsolids.

56. The terms of Plaintiffs' hauling services under the UOSA Contract were based on an

agreement that Plaintiffs would haul at least four (4) loads per day.

57. Ultimately, UOSA's low production, compounded by its illegal overloading practices, financially burdened Plaintiffs and detrimentally hindered Plaintiffs' ability to perform under and otherwise fulfill the terms of the Hauling Agreement in connection with the UOSA Contract.

58. On March 29, 2004, despite Defendants and UOSA's failure to abide by the terms of the UOSA Contract, Defendants terminated Plaintiffs hauling services under the UOSA Contract and took over the hauling services for the UOSA Contract.

59. Plaintiffs continued to provide land application services to Defendants for the UOSA Contract despite Defendants' termination of Plaintiffs' hauling services on March 29, 2004.

60. However, Defendants engaged Caucasian sub-contractors to spread sludge under the UOSA to the exclusion and detriment of Plaintiffs and in breach of their agreement to provide Plaintiffs at least ten (10) loads a day.

61. Defendants offered various reasons for Plaintiffs' disengagement, including not possessing available land for spreading and not having enough loads for Plaintiffs.

62. However, Defendants had plenty of permitted lands during this time on which Caucasian sub-contractors spread sludge and Defendants continued to ship loads to Caucasian subcontractors for land application.

63. In fact, Defendants refused to engage Plaintiffs to the same capacity it engaged the Caucasian sub-contractors despite Plaintiffs having permitted lands on which to spread sludge.

64. Sometime in May 2004, Anderson Trucking Company ("Anderson"), a Caucasian-owned sub-contractor, who was also hauling sludge under the UOSA Contract for Defendants, accused Plaintiff Milton Wright of cursing at some of Anderson's employees. Anderson made its accusations to Defendants and based on Anderson's accusations, Defendants stopped sending sludge to Plaintiffs altogether in August

2004 and eventually terminated Plaintiffs' land application services under the UOSA Contract.

65.     By September 27, 2004, Plaintffs had not received a single load of sludge to spread from Defendants under either the Blue Plains or UOSA Contract.

66.     Plaintiffs protested to Defendants and requested a meeting with Defendants in order to resolve the matter. Defendants refused to meet with Plaintiffs.

67.     Finally, on November 11, 2004, after Defendants had failed to respond to Plaintiffs and failed to engage Plaintiffs, Plaintiffs were forced to terminate all relationships and agreements with Defendants.

## COUNT I

## VIOLATION OF 42 U.S.C.A §1981

68.     Plaintiffs incorporate by reference the allegations of paragraphs 1-67 of the Complaint as if fully stated herein.

69.     Plaintiff Milton Wright, an African-American, is the owner of Plaintiff Milton F. Wright, Inc., a small, Black-owned trucking company.

70.     Defendants deliberately and intentionally treated Plaintiffs differently than Caucasian-owned residuals management companies (the "Caucasian Subcontractors") under all contracts referenced herein.

71.     Under the Piscataway Contract, Defendants deliberately and intentionally engaged Caucasian sub-contractors to provide substantially more land application services than Plaintiffs in breach of Defendants and Plaintiffs' agreement that Plaintiffs would receive at lease 60% of the value of the Piscataway Contract.

72.     Under the Western Maryland Contract, Defendants deliberately and intentionally negotiated and executed sub-contractor agreements with Plaintiffs under which Defendants paid Plaintiffs

significantly less than paid to Caucasian sub-contractors providing the same land application services to Defendants.

73. Defendants were fully apprized at all times that Plaintiffs received less pay per load under the Western Maryland and Blue Plains Contracts for Plaintiffs' land application services to Defendants than did the Caucasian sub-contractors working for Defendants.

74. Under all contracts referenced herein, Defendants deliberately and intentionally engaged Caucasian sub-contractors to provide substantially more land application services than Plaintiffs and failed to engage Plaintiffs to spread the agreed minimum of at least four (4) loads per day.

75. Under the UOSA Contract, Defendants also wrongfully terminated Plaintiffs' sub-contractor hauling services.

76. Finally, Defendants constructively terminated Plaintiffs' spreading services under all pertinent contracts by failing to send Plaintiffs any biosolids for spreading after August 31, 2004 and during the entire month of September and October, thereby attempting to run Plaintiffs out of business and to destroy Plaintiffs' ability to compete and survive as a Black-owned residuals management company.

77. Defendants' actions violated Plaintiffs' rights by denying them the same rights and privileges to contract and to enjoy the benefits of a contract as that enjoyed by Caucasian Subcontractors.

78. As a direct and proximate cause of defendants' discriminatory conduct, Plaintiffs suffered significant financial harm.  Defendants' imposition of a blatant second-class citizenship status also subjected Plaintiff Wright to heightened levels of mental anguish, including frustration, fear, humiliation and embarrassment.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

a. Compensatory damages in excess of $5 million dollars;

b. Punitive damages in excess of  $10 million dollars;

    c.  Statutory attorney's fees and costs; and

    d.  Such other relief as the Court deems appropriate.

**PRAYER FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues so triable.

                                       Respectfully submitted,

                                       Donald M. Temple, PC

By:         _____/S/_____
              Donald M. Temple, #408749
              Johnnie D. Bond, Jr., #485488
              1229 15th Street, NW
              Washington, D.C. 20005
              (202) 628-1101 Phone
              (202) 628-1149 Fax
              Attorney for Plaintiffs

I:\JDB\Cases\Wright, Milton\WrightComplaint(v10).wpd