UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Milton F. Wright and Milton F. Wright Trucking, Inc.<br><br>Plaintiffs,<br><br>vs.<br><br>Synagro Mid-Atlantic, Inc., Synagro Technologies, Inc. and CDR Mid Atlantic<br><br>Defendants. | CIVIL ACTION NO. 01391<br>Judge Richard W. Roberts |

### DECLARATION OF BRENT R. McMANIGAL

I, Brent R. McManigal, state on my oath as follows:

1. My name is Brent R. McManigal. During the time period relevant to this declaration, I was the District Manager of Synagro Mid-Atlantic, Inc. I am no longer employed by Synagro Mid-Atlantic, Inc., or any of its related entities.

2. I have reviewed Plaintiffs' Original Complaint, and I am familiar with "The Piscataway Waste Water Treatment Plant Contract" ("Piscataway Contract") upon which the Plaintiffs bring a portion of their complaints. The Piscataway Contract is attached to this Declaration as Exhibit 1.

3. Synagro Mid-Atlantic negotiated these contracts with Milton F. Wright and/or Milton F. Wright Trucking, Inc. in or from its offices in Oxford, Pennsylvania.

4. There were several letters containing interim agreements, proposals, and negotiations between the parties on the Piscataway project prior to the execution of the contract; however, the Piscataway Contract was the first formal agreement entered into

{00012612.DOC}

EXHIBIT B

between the Plaintiffs and Synagro Mid-Atlantic, where Synagro Mid-Atlantic was a subcontractor. The Piscataway Contract dealt solely with biosolids provided to Milton F. Wright Trucking, Inc. pursuant to its contract with Washington Suburban Sanitary Commission (which is located in Laurel, Maryland) that were generated by the Piscataway Wastewater Treatment Plant (which is located in Accokeek, Maryland).

5. At no time during the negotiations of the Piscataway Contract did any of the negotiations occur, or involve in any manner, the District of Columbia. I am unaware of a single meeting held, fax sent or received, or letter sent or received within the District of Columbia. Synagro Mid-Atlantic did not have an office within the District of Columbia, and, to my knowledge, neither did the Plaintiffs. Additionally, at no time was Milton F. Wright or Milton F. Trucking, Inc. performing any transportation or spreading functions in the District of Columbia under the Piscataway Contract. In other words, the biosolids were generated in Maryland and spread on land in either Maryland or Virginia.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the __11__ day of August, 2005.

*Brent R. McManigal*
Brent R. McManigal

{00012612.DOC}

Milton F. Wright / Piscataway WWTP, MD



EXHIBIT B-1

# SERVICE AGREEMENT

This SERVICE AGREEMENT (hereinafter called the AGREEMENT) made and entered into this 10th day of December, 1999 by and between **Milton F. Wright Trucking, Inc.**(hereinafter called CUSTOMER), and **Synagro Mid-Atlantic, Inc.**, (hereinafter called CONTRACTOR which term shall include its successors and assigns).

## WITNESSETH:

In consideration of the following covenants and AGREEMENTS, the CUSTOMER and the CONTRACTOR hereby mutually agree as follows:

1. SCOPE

   1.1. The CONTRACTOR shall provide biosolids management services in accordance with the terms of this AGREEMENT (hereinafter called SERVICES) of the biosolids made available by the CUSTOMER'S contract (**Contract No. 2127**) with the **Washington Suburban Sanitary Commission (WSSC) to Manage Biosolids.** Said biosolids constitute primarily liquid semi-solid (20%-30% solids) residue generated during the treatment of domestic sewage in a treatment works (hereinafter called RESIDUALS) generated by the Piscataway Wastewater Treatment Plant at Accokeek Maryland (the PLANT), operated by WSSC. A copy of said contract is attached as Attachment A. Both parties entered into a Letter of Intent and subsequent fee schedule both of which are attached as Attachment B.

2. CONTRACTOR OBLIGATIONS

   The CONTRACTOR shall:

   2.1. Cause the land application of CUSTOMER'S RESIDUALS and, in connection with such activities, maintain AUTHORIZATIONS and landowner AGREEMENTS required of CONTRACTOR for agricultural land application and/or disturbed land reclamation in accordance with all applicable LEGAL REQUIREMENTS which are currently in effect or which take effect during the term of this AGREEMENT.

   2.2. At the written request of CUSTOMER, and as applicable, provide any AUTHORIZATIONS which are issued by applicable GOVERNMENTAL AUTHORITIES for all land approved for RESIDUAL land application.

   2.3. Notify the CUSTOMER of any notice of violation, action, suit, claim, or legal proceeding against CONTRACTOR relating to any aspect of the CUSTOMER'S RESIDUALS managed pursuant to this AGREEMENT.

2.4. For RESIDUALS which are land applied, employ land application methods approved or allowed by applicable GOVERNMENTAL AUTHORITIES. In the event Contractor fails to provide land application or storage for the biosolids, in accordance with this contract, Contractor shall provide suitable landfill option. CUSTOMER shall not be permitted to dispose of any residuals in the landfill without the express written permission of CONTRACTOR.

2.5. Develop and implement monitoring, record keeping, and reporting programs as required by applicable LEGAL REQUIREMENTS, and as set forth in Section 6 of this AGREEMENT.

2.6. Provide proof of liability insurance, as set forth in Section 4 of this AGREEMENT.

2.7. Indemnify, CUSTOMER, and hold harmless CUSTOMER, its subsidiaries, affiliates, successors and assigns and their respective directors, officers, employees, shareholders, representatives and agents (hereinafter referred to collectively in this section as CUSTOMER INDEMNITEES) from and against of any and all claims, liabilities, lawsuits, and causes of action, together with reasonable costs, expenses, and attorneys' fees associated therewith and all amounts paid in defense or settlement of the foregoing, which may be imposed upon or incurred by CUSTOMER INDEMNITEES or asserted against CUSTOMER INDEMNITEES by any other person or persons (including GOVERNMENTAL AUTHORITIES), to the extent caused by CONTRACTOR'S breach of its obligations under this AGREEMENT or violation of applicable LEGAL REQUIREMENTS.

2.8. Comply in all material respects with all LEGAL REQUIREMENTS applicable to CONTRACTOR'S provision of the SERVICES.

2.9. CONTRACTOR shall make every effort to utilize CUSTOMER for land application of the residuals produced by the Piscataway on lands permitted by CONTRACTOR. CUSTOMER will spread residuals on lands permitted by CONTRACTOR or CUSTOMER, except for those residuals that go to a storage facility or to land permitted by a party other than CONTRACTOR or CUSTOMER. CONTRACTOR, at its sole discretion, has the option to send a minimum of 10,000 tons to Atlantic Coastal Trucking's permitted land on the Patuxent Naval Air Station, located in St. Mary's County Maryland from January 1, 2000 through March 31, 2000 to facilitate with wet weather operations.

3. CUSTOMER

The CUSTOMER shall:

3.1. Provide to CONTRACTOR for off-site beneficial reuse 100% of the annual volume of RESIDUALS generated at the PLANT and caused to be removed by CUSTOMER.

3.2. Provide CONTRACTOR with reasonable access to the CUSTOMER'S RESIDUAL delivery system, except as reasonably required for safety or emergency considerations, or planned shutdown of the PLANT. It is agreed that when safety, emergency or shutdown conditions prevent access, that both parties will attempt to resolve such conditions as expeditiously as possible.

3.3. Provide CONTRACTOR with a copy of PISCATAWAY's written notice of the concentration of total nitrogen (as N on a dry weight basis) in the RESIDUALS which CUSTOMER receives from its client (WSSC), plus all other information which is required under 40 C.F.R. Part 503, State of Maryland Sludge regulations and the Commonwealth of Virginia Sludge regulations. Information which CONTRACTOR may obtain shall include, without limitation, the monthly average concentrations (in milligrams per kilogram) of arsenic, cadmium, copper, lead, mercury, nickel, selenium, and zinc or other potentially Hazardous Materials present in the RESIDUALS, the level of pathogen reduction which WSSC has achieved, and the method of vector attraction reduction which WSSC has applied. The methods and procedures by which WSSC samples and analyzes concentrations of potentially HAZARDOUS MATERIALS, pathogen reduction, and vector attraction reduction, shall comply with methods and procedures prescribed by applicable LEGAL REQUIREMENTS, including without limitation 40 C.F.R. Part 503. CONTRACTOR may request that CUSTOMER provide contractor with a certification regarding concentrations of HAZARDOUS MATERIALS, pathogen reduction, and vector attraction reduction, as well as certification that all methods and procedures used by WSSC for the sampling and analysis of RESIDUALS comply with requirements of 40 C.F.R. Part 503, and any other applicable LEGAL REQUIREMENTS. The form of certification, and the type of information which the CONTRACTOR may request from CUSTOMER may include the form of certification or the type of information which WSSC must maintain under 40 C.F.R. § 503.17. CONTRACTOR shall have the undisputed right to rely upon any information or certification provided by CUSTOMER, and shall not have any independent duty to investigate or inquire regarding the subject matter of the WSSC'S certification or of the information which CUSTOMER provides to CONTRACTOR.

3.4. Not knowingly provide to CONTRACTOR any RESIDUALS which are hazardous in accordance with 40 C.F.R. Part 261, state law, or which contains a concentration of polychlorinated biphenyls equal to or greater than 50 milligrams per kilogram of total solids (on a dry weight basis). Upon learning that the residuals may not meet land application standards, CUSTOMER shall immediately notify CONTRACTOR so alternative arrangements for the residuals can be made.

3.5. Provide CONTRACTOR with 24 hour advance notice of when CUSTOMER will remove RESIDUALS from the PLANT.

3.6. Indemnify, defend, and protect CONTRACTOR from and against all claims, damages, losses, costs, suits, settlements, causes of action, liabilities (**INCLUDING WITHOUT LIMITATION STRICT LIABILITIES**) fines, penalties, costs, and expenses (including but not limited to, investigation and legal expenses, and costs and expenses associated with Remedial Work) (collectively, CLAIMS) arising out of or in connection with any acts or omissions of CUSTOMER, or its employees, officers, directors, representatives, contractors, subcontractors, agents, or affiliates, or any licensee or invitee of the PLANT (other than CONTRACTOR), or CUSTOMER'S breach of any of its obligations under this AGREEMENT, or any violation of any applicable LEGAL REQUIREMENT by CUSTOMER or any of its employees, officers, directors, representatives, agents, contractors, subcontractors, or affiliates, or its licensees or invitees (other than CONTRACTOR) or any discrepancy in the character or composition of the RESIDUALS from the PLANT compared to analytical results, certifications or other information provided by CUSTOMER to CONTRACTOR. Except for analytical results provided by WSSC.

3.7. From time to time, as requested by CUSTOMER, review a list of proposed land application sites at which RESIDUALS from the PLANT may be applied. In the absence of specific designations by CUSTOMER, CUSTOMER agrees that it shall have been deemed to select any and/or all of such application as satisfactory locations for its RESIDUALS.

3.8. Notify the CONTRACTOR of operating changes or any other conditions that would reasonably be expected to affect the RESIDUALS handled by CONTRACTOR under this AGREEMENT.

3.9. CUSTOMER shall enter into a rental agreement for all equipment provided by the CONTRACTOR for use on this project. CUSTOMER shall abide by all provisions of that rental agreement.

3.10. CUSTOMER agrees to enter in to a separate agreement for the land application of biosolids CUSTOMER will be performing on CONTRACTORS land. Said Agreement shall govern the CUSTOMERS spreading activities and compliance associated with this contract.

4. INSURANCE

The CONTRACTOR shall maintain and provide the CUSTOMER evidence of insurance as follows:

4.1. Worker's Compensation meeting at least the minimum requirements of the laws of the States of Maryland, Virginia, and Employer's Liability with a minimum single limit of $100,000.

4.2. Comprehensive General Liability and Automobile Liability Insurance to include premises operations and subcontractors. Completed Operations and Contractual Liability are to be included under the Comprehensive General Liability coverage. The insurance policies will have limits of no less than $1,000,000.00 per occurrence and $ 2,000,000.00 aggregate.

CUSTOMER shall maintain and provide the CONTRACTOR evidence of insurance as follows:

4.3 Worker's Compensation meeting at least the minimum requirements of the laws of the States of Maryland, Virgina, and Employer's Liability with a minimum single limit of $100,000.

4.3. Comprehensive General Liability and Automobile Liability Insurance to include premises operations and subcontractors. Completed Operations and Contractual Liability are to be included under the Comprehensive General Liability coverage. The insurance policies will have limits of no less than $1,000,000.00 per occurrence and $ 2,000,000.00 aggregate.

5. PAYMENT

The CUSTOMER shall provide the CONTRACTOR with an accounting of the tons of RESIDUALS removed from the <u>PLANT, for this purpose CONTRACTOR may communicate directly with plant.</u> CUSTOMER will utilize certified weight scales approved by PLANT to measure tonnage of RESIDUALS removed from the PLANT. The CONTRACTOR will be provided with manifests and certified weight tickets for all loads removed by the CUSTOMER.

5.1. The CONTRACTOR shall submit invoices once each month for SERVICES provided by CONTRACTOR, using the rates and the amounts agreed in Section 10 of this AGREEMENT. The CUSTOMER shall pay all invoices within 30 days after receipt of the invoice, or within 3 days of receiving payment from WSSC.

5.2. It is agreed that in the event of any dispute concerning invoice amount, CUSTOMER will pay undisputed invoice amounts within 30 days after receipt of the invoice.

6. RECORD KEEPING

The CONTRACTOR shall maintain records and submit <u>summary</u> reports to the CUSTOMER monthly and on an annual, cumulative basis. Reports shall include information regarding, but not be limited to:

6.1. Number of loads transported and applied with identification of utilization site(s).

6.2. Cumulative dry tons applied at each utilization site.

6.2. Such other information as will reasonably allow CUSTOMER to fulfill its recordkeeping and reporting requiements under applicable LEGAL REQUIREMENTS.

7. NOTICES

Except as otherwise provided herein, any notice, demand or other communication shall be in writing and shall be personally served, sent by commercial courier service or prepaid registered or certified mail, or sent by telephonic facsimile delivery with confirmation thereof. Any such notice shall be deemed communicated upon receipt.

7.1. The following address is hereby designated as the legal address of the CONTRACTOR. Such address may be changed at any time by notice in writing delivered to CUSTOMER.

Synagro Mid-Atlantic, Inc.
P.O. Box 70
59 South 3rd Street
Oxford, PA 19363
(610) 932-0900
Fax: (610) 932-5459
Attention: Brent McManigal

<u>With a copy to:</u>
Alvin L. Thomas II
General Counsel
Synagro Technologies, Inc.
1800 Bering Drive, Suite 1000
Houston, Texas 77057
(713) 369-1700

7.2. The following address is hereby designated as the legal address of the CUSTOMER. Such address may be changed at any time by notice in writing delivered to CONTRACTOR.

|  |  |
|---|---|
| Name: | Milton F. Wright Trucking, Inc. |
| Street Address: | 14814 Cloverdale Road |
| Mailing Address: | Woodbridge, VA 22193 |
| Phone Number: | (703) 973-9529 (mobile) |
| Contact Person: | Milton F. Wright |
| Fax: | (301) 681-3260 |

8. FORCE MAJEURE

Wherever the word "Force Majeure" is used, it should be understood to mean:

8.1. acts of God, landslides, lightning, earthquakes, hurricanes, tornadoes, blizzards and other adverse and inclement weather, fires, explosions, floods, acts of a public enemy, wars, blockades, insurrections, riots or civil disturbances;

8.2. labor disputes, strikes, Work slowdowns, or Work stoppages;

8.3. orders or judgements of any Federal, State or local court, administrative agency or governmental body, if not the result of willful or negligent action of the party relying thereon;

8.4. power failure and outages affecting the Premises; and

8.5. any other similar cause or event, including a change in law, regulation, ordinance or permit, provided that the foregoing is beyond the reasonable control of the party claiming Force Majeure.

If, because of Force Majeure any party's cost is increased by more than 15% or any party hereto is rendered unable, wholly or in part, to carry out its obligations under this Contract, then such party shall give to the other party prompt written notice of the Force Majeure with reasonable full details concerning it; thereupon the obligation of the party giving the notice, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure. The affected party shall use all possible diligence to remove the Force majeure as quickly as possible, but his obligation shall not be deemed to require the settlement of any strike, lockout, or other labor difficulty contrary to the wishes of the party involved. If, because of Force Majeure Synagro's cost is increased then CUSTOMER agrees to increase the price paid to Synagro to cover those increased costs for the duration of the Force Majeure, to the extent that WSSC will increase CUSTOMER'S price during said period.

9. TERM

9.1. This AGREEMENT shall be effective from the EFFECTIVE DATE until June 30, 2000 (the INITIAL TERM). At the end of this term, this AGREEMENT will be extended on a yearly basis in conjunction with any and all extensions granted to CUSTOMER by WSSC. Either party may terminate this AGREEMENT and shall have no further obligations to other under this AGREEMENT if (i) the other party fails to observe or form any material covenant or agreement contained in this agreement for ten (10) business days after written notice thereof has been given to such other party or (ii) at any time upon the insolvency of the other party, or the institution by or against the other party of any proceeding in bankruptcy or insolvency or for the appointment of a receiver or trustee or for an assignment for the benefit of creditors.

9.2. CONTRACTOR may terminate this AGREEMENT at any time upon written notice to CUSTOMER and have no further obligation to CUSTOMER if:

9.2.1. The CONTRACTOR is unable to utilize the RESIDUALS due to a change in any LEGAL REQUIREMENTS that renders the SERVICES illegal, or place such restrictions or requirements thereon so as to make the provision of the SERVICES cost prohibitive or to otherwise frustrate the commercial intent of this AGREEMENT.

9.2.2. The RESIDUALS become unsuitable for land application by the CONTRACTOR by reason of (i) the act or omission of any third party or CUSTOMER, and through no fault of CONTRACTOR, or (ii) the condition of the RESIDUALS is materially inconsistent with the description and analysis, certifications or other information the CUSTOMER has provided to the CONTRACTOR regarding the RESIDUALS, including analytical results attached in Exhibit A, or (iii) CUSTOMER breaches its obligations hereunder regarding the quality of the RESIDUALS.

10. PRICE

10.1. Except as otherwise provided in this AGREEMENT, CUSTOMER will pay the following fixed prices for CONTRACTOR'S SERVICES hereunder for the duration of the INITIAL TERM of this Agreement

| | |
|---|---|
| Cake Residuals | $17.51 per wet ton |
| Trailer Rental (per month) | $350.00 per trailer |

10.2. The CONTRACTOR'S prices shall be increased annually consistent with any and all increases granted to CUSTOMER by WSSC based on the Consumer Price Index (CPI) for the closest metropolitan area to the PLANT. CPI adjustments shall

automatically become effective on the same date as the CUSTOMER'S EFFECTIVE DATE of such increases.

10.3. Except as otherwise provided in this AGREEMENT, CONTRACTOR will pay the following fixed prices for CUSTOMER'S SERVICES hereunder for the duration of the INITIAL TERM of this Agreement.

| | |
|---|---|
| Land Application on Synagro permitted land | $5.00 per wet ton |
| Bonus for Land Application on Synagro permitted land, 100 miles or less from PLANT | $1.50 per wet ton |
| Trucking surcharge for mileage to fields in excess of 100 miles (one way) from PLANT: | |
| 101-110 miles | $3.25 per wet ton |
| 111-120 miles | $3.84 per wet ton |
| 121-130 miles | $4.97 per wet ton |
| 131-140 mile | $5.30 per wet ton |
| Land Application on M.F. Wright permitted land (total price, no bonuses or trucking charges) | $10.50 per wet ton* |

11. MISCELLANEOUS PROVISIONS.

    11.1. Assignment. The CUSTOMER and/or CONTRACTOR shall have the right to assign this AGREEMENT in writing to any successor in interest, subject to the written approval of the other party, which approval shall not be unreasonably withheld. However, CONTRACTOR may assign its rights and duties to an affiliate or related party of CONTRACTOR.

    11.2. Governing Law. THIS AGREEMENT AND ALL THE RIGHTS AND DUTIES OF THE PARTIES ARISING FROM OR RELATING IN ANY WAY TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY IT, SHALL BE GOVERNED BY, CONSTRUED, AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MARYLAND EXCEPT ANY CONFLICT OF LAWS RULES WHICH WOULD REFER TO AND APPLY THE SUBSTANTIVE LAWS OF ANOTHER JURISDICTION.

    11.3. Costs and Fees. The prevailing party in any legal proceeding brought by or against the other party to enforce any provision or term of this AGREEMENT shall be entitled to recover against the non-prevailing party the reasonable attorneys' fees, court costs and other expenses incurred by the prevailing party.

11.4. **Consent to Breach Not Waiver.** No term or provision hereof shall be deemed waived and no breach excused, unless such waiver or consent be in writing and signed by the party claimed to have waived or consented. No consent by any party to, or waiver of, a breach by the other party shall constitute a consent to, waiver of, or excuse of any other different or subsequent breach.

11.5. **Severability.** If any term or provision of this AGREEMENT should be declared invalid by a court of competent jurisdiction, (i) the remaining terms and provisions of this AGREEMENT shall be unimpaired, and (ii) the invalid term or provision shall be replaced by such valid term or provision as comes closest to the intention underlying the invalid term or provision.

11.6. **ENTIRE AGREEMENT. THIS AGREEMENT AND ANY ATTACHMENTS HERETO CONSTITUTE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES WITH REGARD TO THE MATTERS SET FORTH HEREIN, AND IT SUPERSEDES ALL OTHER AGREEMENTS, PROPOSALS, AND REPRESENTATIONS, ORAL OR WRITTEN, EXPRESS OR IMPLIED, WITH REGARD THERETO.**

11.7. **Amendments.** This AGREEMENT may be amended from time to time only by an instrument in writing signed by the parties to this AGREEMENT.

11.8. **Counterparts.** This AGREEMENT may be executed in counterparts, which together shall constitute one and the same contract. The parties may execute more than one copy of this AGREEMENT, each of which shall constitute an original.

11.9 **Equipment.** CONTRACTOR will provide, not later than 30 days from the signing, two (2) additional trailers seven (7) total at plant to CUSTOMER for use in this project. Said trailers to be maintained, by CUSTOMER in accordance with industry standards and state and federal Department of Transportation (DOT) regulations for maintenance and inspections and Maryland and Virginia regulations for hauling sludge.

12. DEFINITIONS

12.1. "AUTHORIZATIONS" means all authorizations, permits, applications, notices of intent, registrations, variances, and exemptions, required for the removal and transportation of RESIDUALS in compliance with all applicable LEGAL REQUIREMENTS.

12.2. "RESIDUALS" digested sewage sludge meeting Class B (as defined by 40 CFR Part 503 and **States of Maryland and Virginia** requirements that (i) has been dewatered to a minimum of 13%. Residuals do not include any hazardous materials or substance and must be suitable for land application under the applicable law.

12.3. ENVIRONMENTAL LAWS" means any AUTHORIZATION and any applicable federal, state, or local law, rule, regulation, ordinance, order, decision, principle of common law, consent decree or order, of any GOVERNMENTAL AUTHORITY, now or hereafter in effect relating to HAZARDOUS MATERIALS, RESIDUALS, or the protection of the environment, health and safety, or a community's right to know, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, the Resource Conservation and Recovery Act, the Safe Drinking Water Act, the Clean Water Act, the Clean Air Act, the Emergency Planning and Community Right to Know Act, the Hazardous Materials Transportation Act, the Occupational Safety and Health Act, and any analogous state or local law.

12.4. "GOVERNMENTAL AUTHORITY" means any foreign governmental authority, the United States of America, any State of the United States of America, any local authority, and any political subdivision of any of the foregoing, and any agency, department, commission, board, bureau, court, tribunal or any other governmental authority having jurisdiction over this AGREEMENT, RESIDUALS, or COMPANY, HAULER, or any of their respective assets, properties, sites, facilities or operations.

12.5. "HAZARDOUS MATERIALS" means any "petroleum," "oil," "hazardous waste," "hazardous substance," "toxic substance," and "extremely hazardous substance" as such terms are defined, listed, or regulated under ENVIRONMENTAL LAWS, or as they become defined, listed, or regulated under ENVIRONMENTAL LAWS.

12.6. "LEGAL REQUIREMENT" means any AUTHORIZATION and any applicable federal, state, or local law, rule, regulation, ordinance, order, decision, principle of common law, consent decree or order, of any GOVERNMENTAL AUTHORITY, now or hereafter in effect, including without limitation, ENVIRONMENTAL LAWS.

12.7. "REMEDIAL WORK" means investigation, monitoring, clean-up, containment, removal, storage, remedial or restoration work associated with HAZARDOUS MATERIALS or RESIDUALS.

IN WITNESS WHEREOF, the parties of this AGREEMENT have hereunto set their hands and seals, dated as of the day and year first herein written.

("CUSTOMER")

By: *Milton H Wright*     ATTEST: *Lloyd E. Wright*

Name & Title: *Milton F. Wright - Owner*    Name & Title: *Lloyd E Wright*
          *Dec. 18, 1999*                             *Agronomist*

Synagro Mid Atlantic, Inc. ("CONTRACTOR")

By: _____     ATTEST: *Kelly M Love*

Name & Title: <u>Brent R. McManigal</u>    Name & Title: *Kelly M. Love*
          District Manager                         *Agronomist*